**FILED**

December 21, 2021

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____ CC

DEPUTY

**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 1:09-cv-00490-LY |
| | ) | |
| THE STATE OF TEXAS, et. al, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

**MEMORANDUM IN SUPPORT OF MONITOR'S MOTION
FOR PROTECTIVE ORDER**

1.      Now comes the Monitor *pro se*, Maria Laurence ("Monitor"), to request that the Court issue

an order to protect the independent Monitors' records and communications.  For the reasons set

forth below, such an order is necessary with 1) the resignation of one of two appointed Monitors;

2) agreement between Plaintiff, United States of America ("United States"), and Defendants, the

State of Texas *et al.* ("State," and collectively "the Parties") to appoint Dr. Alan Harchik as the

sole successor Monitor; and 3) the State's assertion that pursuant to a paragraph in its contract

with the Monitor, in place to affect payment of the Monitor's fees and expenses, that on

December 31, 2021, upon the end of its contract with the Monitor, the State has ownership of

and takes possession of all Monitor files, documentation, and products.  Whereas independent

monitoring is still required for the implementation of the Court's September 7, 2021 Order, ECF

No. 29 ("September 2021 Order"), and the Monitor's attempts to work with the State to resolve

the inherent conflict in providing all documents related to communication with the other

1

Monitor(s) and the management of the Monitoring Team(s) to the State have been unsuccessful, the Monitor seeks the Court's intervention.

      I.      BACKGROUND

      A.      <u>Court's Orders Requiring Independent Monitoring</u>

2.      As part of the Court's Order on June 29, 2009, ECF No. 4 ("June 2009 Order"), as well as the September 2021 Order, the Parties jointly agreed to use and the Court ordered use of an independent Monitor(s) to assess the State's compliance with the Court's Orders.  As the Court is aware, the Orders relate to the State's provision of supports, services, and treatment to residents of 13 State Supported Living Centers ("Centers") that the State owns and operates.

3.      Section V.A of the September 2021 Order states:  "Monitors presently appointed or who may be appointed in the future pursuant to this section (the 'Monitors') will jointly monitor, as described in Part VI of this Amended Agreement, the State's implementation of Parts II and III.B of this Amended Agreement…  The Monitors shall have full authority to assess, review, and report independently on the Center's implementation of and compliance with the Amended Agreement…  No Party, nor any employee or agent of any Party, shall have any supervisory authority over the Monitoring Team's activities, reports, findings, or recommendations.  In the event that a Monitor is unable to serve or continue serving as a Monitor… the Parties shall… select a new Monitor…"[1]

---

[1] Section III.E of the June 2009 Order included an almost identical description of the expectation for independent monitoring.  Because at the time the Court issued the June 2009 Order, the Parties had not yet selected Monitors, the first sentence of the paragraph reads:  "The Parties jointly agree to appoint an expert or experts to monitor the Facilities' implementation of this Agreement (the 'Monitor')…"

4.      Section V.B of the September 2021 Order sets forth expectations related to the Monitoring

Team.  It specifically provides that:  "The Parties agree that the Monitors may use consultants to

assist the Monitors in carrying out their responsibilities under this Amended Agreement.  These

consultants shall work under the direction of the Monitors, assist the Monitors in monitoring the

Centers' compliance with this Amended Agreement…  No Party, nor any employee or agent of

any Party, shall have any supervisory authority over the Monitoring Team's activities, reports,

findings, or recommendations." [2]

5.      The June 2009 Settlement Agreement and Order anticipated that the Monitors would need to

confer to ensure consistency of monitoring, and set forth a process for doing so.  Section III.O of

the June 2009 Order reads:

> Consistency of Monitoring.  The experts appointed as Monitor shall
> collectively serve as a 'Monitoring Panel.'  The Monitoring Panel shall seek
> to ensure a consistent methodology in determining compliance and substantial
> compliance with the provisions of this Agreement.  If either Party or member
> of the Monitoring Panel requests that the Monitoring Panel resolve an
> apparent inconsistency in the methodology used to assess compliance with
> any provision of this Agreement, the Monitoring Panel shall confer and issue
> a written decision addressing the claimed inconsistency within 30 days of the
> request.   The decision of a majority of the Monitoring Panel shall control as
> to the monitoring methodology…

6.      Section VI.A.3 of the September 2021 Order sets forth the expectations for the orderly

transmission of the Monitors' findings, including submission of a draft report to the Parties

within 45 days of each Center's review, the Parties' submission of comments within 21 days, and

the Monitors' finalization of the report within 14 days.[3]

---

[2] Section III. F of the June 2009 Order included almost identical language with minor differences
(e.g., using the term "expert" in place of "consultant," and "Facility" in place of "Center").
[3] Sections III.H and III.I of the Court's June 2009 Order included an almost identical process.
Differences in the September 2021 Order include changes to the frequency of reviews,
timeframes for reports, and the allowance for State Reviewers eventually to submit reports.

B.      History of Appointment of Independent Monitors

7.      In November 2009, the Parties selected three Monitors to implement the independent

monitoring provisions of the June 2009 Order.  The parties selected Dr. Michael Davis, Dr. Alan

Harchik, and Ms. Laurence as the three Monitors, composing the Monitoring Panel.  With the

Parties' agreement, each Monitor hired consultants to assist them with monitoring activities.

8.      In 2014, Dr. Davis resigned, and with some modifications to the responsibilities for

monitoring the 13 Centers, the Parties agreed that Dr. Harchik and Ms. Laurence would continue

as Monitors and assume responsibility for the portions of monitoring for which Dr. Davis was

previously responsible.  (In their "Joint Notice of Agreed-Upon Modifications to Monitoring

Framework," dated 1/14/15, ECF No. 26, the parties notified the Court of the agreed-upon

monitoring changes.)  A portion of the consultants that Dr. Davis used to assist him with

monitoring continued under the direction of Dr. Harchik and/or Ms. Laurence.

9.      On May 24, 2021, the Monitor submitted a letter to the Parties announcing her resignation

from the role of Monitor (attached as Exhibit A).  In it, she offered to continue through the end

of the seventeenth round of monitoring currently underway (i.e., with the last report due on

February 10, 2022).  Since that time, the Parties agreed that Dr. Harchik, with the assistance of

two Assistant Monitors, would assume responsibility for all monitoring of all 13 Centers,

beginning with the eighteenth round of monitoring, which also is currently underway.  Most

consultants that the outgoing Monitor engaged currently continue as consultants to Dr. Harchik.

C.      Contract Pursuant to Texas Prompt Payment Act

10.     Section V.A of the September 2021 Order states:  "HHSC [Health and Human Services

Commission] shall pay all reasonable costs and expenses incurred by the Monitors, in

accordance with the Texas Prompt Payment Act, in the course of carrying out his/her duties

under this Amended Agreement."[4]  Beginning in 2009 and every year since, the Monitors

negotiated budgets and entered into a contract with the State to facilitate payment through the

Texas Prompt Payment Act (Monitor's Contract, executed December 30, 2009, attached as

Exhibit B) ("Contract").  The Monitoring Panel worked with the State to modify the boiler plate

language of a typical contract designed to meet the State's needs under its Prompt Payment Act,

while directly referencing the Settlement Agreement requirements as the Scope of Work.

11.     For the 2016 contract year, an amendment to the Scope of Work section of the Monitor's

contract, executed on December 18, 2015, reflected the changes to monitoring.  The revised

scope of work (attached as Exhibit C), which remains in place at this time and terminates on

December 31, 2021, directly references compliance with the Settlement Agreement (i.e. Court's

Order).  Section 3.A reads:

> Monitoring Services.  The Monitor and the members of the Monitor's team,
> working under the direction of the Monitor, shall monitor aspects of the
> Settlement Agreement at all 13 State Centers. The Monitor will focus on
> physical/medical health.  In addition, the Monitor will have responsibilities
> regarding the monitoring of the integration of supports, clinical service, records,
> quality assurance and any other facility/system related to the Settlement
> Agreement.
>
> The Monitor shall adhere, and shall require the members of its monitoring team to
> adhere, to all Settlement Agreement duties and requirements pertaining to the
> Monitor and members of the monitoring team.

12.     Currently at issue is Paragraph III.G of the Monitor's contract with the State, which reads:

"In the event the Contract is cancelled for any reason, or upon its expiration, the Department

shall retain ownership of all Monitor files, documentation, and products prepared as part of this

Contract in whatever form they exist."

---

[4] Section III.E of the June 2009 Order contains almost identical language, except for the use of
the word "State" instead of "HHSC."

D.     State's Request for Records Pursuant to Resignation of Monitor

13.     On November 23, 2021, a Health and Specialty Care System (HSCS) Contracts Team

member contacted the Monitor to initiate returning the case work product to HHSC.  The

Monitor requested clarification from Susan Davis, Special Counsel for State Supported Living

Centers.  As part of her November 23, 2021 email response (attached as Exhibit D), Ms. Davis

indicated: "Under that contract, HHSC retains ownership of 'all Monitor files, documentation,

and products prepared as a part of this Contract in whatever form they exist. . .'  These are the

documents we are working with you to transfer to HHSC upon the termination of your contract."

14.     Recognizing that the end of the Monitor's tenure on the case did not coincide with the end of

the case, and that the current wording of paragraph III.G had the potential to undermine aspects

of the Court's Order in this ongoing case, the Monitor sent a letter to the State, dated December

2, 2021 (attached as Exhibit E).  In that letter, the Monitor requested a modification to her

contract.  Section III.A of the contract allows for modification of the contract "by written

agreement of the parties."  The Monitor proposed the following addition to the paragraph in

question:  "In the event that the Monitor terminates the contract prior to the end of case, the

Monitor shall transfer all files, documentation, and products prepared as a part of this Contract in

whatever form they exist to the successor Monitor."

15.     In her letter, the Monitor identified a number of concerns with the State's blanket request for

a transfer of all files, documentation, and products prepared as a part of the contract in whatever

form they exist.  In part, this included portions of the record set related to: 1) ex parte

communication, and 2) management of the Monitoring Team.  The Monitor proposed the

modification to the contract as a mechanism to preserve the documentation for transfer to the

State at the end of the case, while protecting ex parte communications, as well as the records and

communications related to the management of the Monitoring Team in order to maintain the integrity of the independent monitoring that the Court's Orders require.

16.     In an email response, dated December 6, 2021 (attached as Exhibit F),  Ms. Davis communicated the State's decision to decline the Monitor's request, and stated: "You can segregate your ex parte communications with the DoJ into a separate file for the Parties to discuss."

17.     In an email, dated December 8, 2021 (attached as Exhibit G), Kyle Stock, Trial Attorney for the United States, requested that the Monitor "refrain from transmitting documentation until the Parties have discussed this," and expressed the United States' concerns about "documentation in two categories:  1) ex parte communications, and 2) internal monitoring team deliberations."

18.     On December 9, 2021, counsel for the United States, counsel for the State Supported Living Centers as well as the Texas Attorney General's Office, three HHSC State Office staff, Dr. Harchik, and the Monitor participated in a meeting to discuss the concerns raised.  In an email on December 10, 2021 (attached as Exhibit H), Ms. Davis reiterated the State's declination of the Monitor's request for a modification of the contract.

19.     In her email of December 10, 2021, Ms. Davis also stated: "While you appear to be signaling an intent to breach the terms of your contract, to date, no breach related to the State's ownership of the records has occurred.  Should such a breach occur, the State will examine its options at that time."

20.     In a letter, dated December 14, 2021 (attached as Exhibit I), the Monitor again expressed her concerns about the State's apparent unwillingness to address the conflict between the overly-broad contract language and the interests of the Court's Orders.  The Monitor further detailed the negative impact of providing documents and communication related to the management of the

Monitoring Team on the portions of the Court's Orders requiring independent monitoring.[5]  The Monitor indicated that the State's position placed her in the position of either violating the expectations of the Court's Orders or becoming subject to the ramifications of what the State potentially views as a breach of contract.  The Monitor notified the State of her intent to "notify the Court through a formal filing of the dispute, my efforts to resolve it with the State, and to propose remedies… by early during the week of 12/20/21."

21.     The State has provided no response to the Monitor's most recent letter.

## II.     RELIEF SOUGHT

22.     The Monitor respectfully requests that the Court issue a protective Order to include that until the case is dismissed, the Parties are not entitled to access the Monitor(s)' records or communications, although the Monitor(s) may provide copies of records or communications at the Monitor(s)' discretion.  The Court may review all records of the Monitor(s) at the Court's discretion.  In the case of a Monitor's departure from the role, the departing Monitor shall provide copies of their records and communications to the successor Monitor.

## III.     GROUNDS FOR SEEKING ORDER

23.     Despite the resignation of one Monitor, this is an ongoing case over which the Court maintains jurisdiction.  At this juncture, the Monitor's transmission to the State of all records of and communications between the Monitoring Panel and the members of the Monitoring Teams would undermine the independence of the past, present, and future monitoring that the Court's Orders require, as well as the working relationships between Dr. Harchik and the current Monitoring Team members.

---

[5] In this letter, the Monitor expressed her willingness to begin providing copies to the State of records not in dispute.

24.     In setting forth reporting requirements, the Court's June 2009 and September 2021 Orders define a specific orderly process for sharing compliance-related decision-making.  The agreed-upon process did not contemplate that the Monitors would share all of their internal drafts or communication with either or both parties.  Such an expectation would clearly compromise the independence of the Monitor's Office.

25.     Preserving the independence of the Monitor's Office beyond one Monitor's tenure on the case is essential, because a Monitor's findings outlive their tenure.  For example, Dr. Harchik and the parties are using and will continue to use findings from the current round of monitoring, as well as the findings from previous rounds of monitoring to make decisions about the Centers' substantial compliance with the provisions of the Court's September 2021 Order.  The Monitor's transmittal to the State of documentation of the deliberative processes necessary to make findings would compromise the independence of the monitoring process for the present and previous rounds of monitoring.

26.     Since 2015, with the modifications to monitoring, Dr. Harchik and the Monitor have shared responsibility for monitoring all 13 Centers.  They have submitted joint reports, which has required close collaboration between the two of them.  They also have shared oversight responsibility for various aspects of the Monitoring Team's work, including their onsite/remote work at the Centers for which they each took alternating lead responsibility.  As such, a clear demarcation line does not exist between their two offices.  The State's insistence on obtaining materials related to the Monitor's management of the Monitoring Team jeopardizes Dr. Harchik's ability to act independently without one party having access to the records and communications of the Monitoring Team.

27.     In order for the current Monitoring Team under Dr. Harchik's leadership to operate

effectively, they need the ability to communicate freely, share ideas, sometimes disagree

internally, all while knowing that neither party will have the ability to scrutinize their past,

present, or future interactions.  Such a deliberation process has been and continues to be

necessary in order for the Monitors to issue findings that are well-supported, and consistent with

the Court's Orders.  As Section III.O of the June 2009 Order anticipated, such internal

deliberations are necessary for consistency of monitoring.  Section III.O sets forth a process for

deliberation with the expectation that the Monitors would share only their final determination(s).

The Monitor's transmittal to the State of documentation of all such past interactions would have

a chilling effect on future interactions amongst Dr. Harchik and the Monitoring Team members.

28.     The Monitor's proposed language for the protective order is consistent with the Monitors'

practice since the inception of monitoring in early 2010.  This Monitor, as well as Dr. Harchik,

and Dr. Davis used their discretion to identify situations in which sharing internal records or

communications would further the goals of the Court's Order(s).

29.     Although, at times, the State and/or the United States requested additional access to records

or communications, the Monitors continued to use their discretion in making decisions about

what to share.  Since the Court's original June 2009 Order, neither party has petitioned the Court

for greater access to the Monitor's records or communications.

        IV.     CONCLUSION

30.     At this time, the Monitor is approaching the end of her tenure as an active participant in the

independent monitoring process.  However, the Court maintains active jurisdiction of the case.

While the case is active, preserving the independence of all Monitors' previous, present, and

future compliance determinations is of paramount importance.  This requires protecting the

Monitors' and Monitoring Panel's past, present, and future deliberative processes with one another as well as members of the Monitoring Teams.  The Monitor's transmission of "all Monitor files, documentation, and products" in response to the State's request, therefore, would undermine the independence of the monitoring that has occurred to date, and jeopardize the future independence of Dr. Harchik's monitoring of Centers' compliance with the Court's Orders.

31.    The Monitor's attempts to work with the State to correct the overly-broad language in the contract, specifically as it relates to the Monitor's records and communications, have failed.  As such, the Monitor respectfully requests an order to protect those records and communications with allowances for the Monitor(s) to use their discretion to share such records or communications, and for the Court to access them at its discretion.


Respectfully submitted,

Date:   December 21, 2021                                      /s/Maria E. Laurence
                                                             Signature

                                                             Maria E. Laurence
                                                             Monitor
                                           Address:          15 Stanford Road
                                                             Franklin, MA  02038
                                           Email:            Mlaurence123@gmail.com
                                           Phone:            (774) 239-8871

CERTIFICATE OF SERVICE

I, Maria Laurence, Monitor *pro se*, do hereby certify that on the __21st__ Day of __December__, 2021, a true and correct copy of foregoing pleading and corresponding Proposed Order, was forwarded by electronic mail and FedEx to the attorneys for the Defendants and Plaintiff, and Co-Monitor, including the following:

Attorneys for Defendants, State of Texas, et al.:    Kimberly Gdula
Assistant Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, TX 78711
Kimberly.Gdula@oag.texas.gov

Susan E. Davis, Esq.
Special Counsel for State Supported Living Centers
Health and Human Services Commission
701 W. 51st Street
Austin, TX 78751
Susan.Davis@hhsc.state.tx.us

Attorneys for Plaintiff, United States:    Kyle Stock
U.S. Department of Justice
Special Litigation Section
950 Pennsylvania Avenue, NW
Washington, DC 20530
Kyle.Stock@usdoj.gov

Benjamin Tayloe, Esq.
U.S. Department of Justice
Special Litigation Section
950 Pennsylvania Avenue, NW
Washington, DC 20530
Benjamin.Tayloe@usdoj.gov

Monitor:    Alan Harchik, Ph.D., BCBA-D
Monitor
2188 Devon Circle
Ann Arbor, MI 48105
alanharchik@gmail.com

Signature:    /s/ Maria E. Laurence