UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Civ. No. 1:09-cv-00490-RP |
| | ) | |
| v. | ) | |
| | ) | |
| STATE OF TEXAS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**JOINT MOTION TO DISMISS**

For the reasons set forth below, Plaintiff and Defendants (collectively, the "Parties") jointly move the Court to dismiss this case with prejudice. In summary, the Parties have determined that the State has met sustained substantial compliance with the terms of the Amended Settlement Agreement in this case. This motion outlines a success story, where the State has implemented reforms that have transformed services provided to people with intellectual or developmental disabilities (IDD) residing in the State's 13 state operated facilities.

I.     BACKGROUND AND PROCEDURAL HISTORY

A     Notice of Investigation, Investigation, Findings Letters

On March 17, 2005, the United States notified then-Governor Rick Perry of its intent to conduct an investigation under the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997, of the Lubbock State School (now the Lubbock State Supported Living Center) ("Lubbock SSLC"). During the week of June 13, 2005, the United States conducted an onsite review of Lubbock SSLC with a team of expert consultants. On December 11, 2006, the United States issued findings concluding that Lubbock SSLC substantially departed from generally accepted professional standards of care in that the facility failed to: (1) provide adequate health

care (including nursing services, psychiatric services, general medical care, pharmacy services, dental care, occupational and physical therapy, and physical and nutritional management); (2) protect residents from harm; (3) provide adequate behavioral services, freedom from unnecessary or inappropriate restraint, and rehabilitation; and (4) provide services to qualified individuals with disabilities in the most integrated setting appropriate to their needs. Ex. A (Lubbock findings letter) at 2-3.

In 2008, the United States notified then-Governor Rick Perry first of its intent to conduct a CRIPA investigation of the Denton State School (now the Denton State Supported Living Center), then of its intent to expand the CRIPA investigation to include the remaining state operated facilities. On September 9, 2008, the United States requested a range of documents from the State regarding the operations of the 12 state supported living centers for which findings had not been issued.

In the spirit of cooperation and with the mutual goal of moving quickly to implementation of lasting reform, the United States and the State agreed to forego additional on-site inspections at the remaining facilities. The United States' review of the remaining facilities was based upon a system-wide document review including external regulatory surveys and investigations, statistical data, and public information.

On December 1, 2008, the United States issued findings concluding that conditions and practices at the remaining 12 facilities violated the constitutional and federal statutory rights of the residents. The United States found that the facilities failed to provide the residents with adequate: (1) protection from harm; (2) training and associated behavioral and mental health services; (3) health care, including nutritional and physical management; (4) integrated supports and

services and planning; and (5) discharge planning and placement in the most integrated setting. Ex. B (Statewide findings letter) at 12.

B. <u>Settlement Agreement</u>

Following the issuance of the Lubbock SSLC findings letter, the United States and the State began negotiating the terms of a settlement agreement regarding that facility. Following the issuance of the statewide findings letter, the negotiations expanded to encompass all 13 facilities.

The Parties reached an agreement, and a Settlement Agreement was filed with the Court on June 26, 2009. ECF 2. On June 27, 2009, the Court granted the Parties' joint motion to file the Settlement Agreement and retained jurisdiction to enforce the Settlement Agreement. ECF 4.

The terms of the Settlement Agreement addressed the remedial measures identified in the findings letters and required the State to implement changes at each center. Monitoring for compliance with the terms of the agreement would be conducted by three Independent Monitors. Once a center attained substantial compliance with a section of the agreement, monitoring of that section would end. Substantial compliance with a section would be achieved when a center implemented the section for the individuals residing in or transitioned out of the centers. A section for the purposes of determining substantial compliance with the Settlement Agreement meant a section identified by a capital letter in Part II of the Agreement.

For each facility, the Settlement Agreement contained a soft target of five years for the agreement to terminate as to any section in which the center was in substantial compliance for at least one year. ECF 2 at Parts III.Q. and III.R. In anticipation of this five-year target, the settlement agreement required the Independent Monitors to prepare a report within 60 days of the four-year anniversary of the agreement's effective date (the "Four-Year Report"). This Four-Year Report would provide the Parties and the Court with an assessment of the status of compliance with each

substantive provision of the agreement as to each center. The Court would retain jurisdiction over any remaining substantive provisions that were not identified in the Four-Year Report as having achieved substantial compliance. *Id.* at Part III.Q.

C.      Independent Monitors

Because the scope of the Settlement Agreement addressed 13 facilities with a combined census of 4,553 residents at the onset of the agreement, the Parties jointly agreed to the appointment of Independent Monitors. Initially, three Monitors were appointed, and the centers were divided between them so that each Monitor, with the assistance of a team of subject-matter experts, was responsible for conducting a review of all areas of the Settlement Agreement for the centers he or she was assigned. In time, the number of Monitors was reduced to two, with one Independent Monitor being primarily focused on physical health and the other Independent Monitor primarily focused on behavioral and psychiatric health.

At the end of December 2021, the second of the original three Independent Monitors retired. Rather than appointing a new Independent Monitor, the Parties and the remaining Independent Monitor agreed to have the remaining Independent Monitor assume the responsibility for reviewing all remaining provisions at all 13 centers. By this point, numerous sections and provisions at all centers had been found in substantial compliance and were no longer subject to monitoring. Additionally, the remaining Independent Monitor oversaw the training of the State Reviewers and the successful transition of monitoring responsibilities from his team to the State Reviewers, as described in section I.F. below. The Independent Monitor prepared a declaration in support of this Motion, which is attached hereto as Exhibit C.

D.  Four-Year Report and Revision of the Review Process

On-site reviews of the centers commenced in January 2010, and the Independent Monitors conducted subsequent reviews at each center every six months.

On June 25, 2014, in accordance with the terms of the Settlement Agreement, the Independent Monitors produced a report that documented the status of compliance with the agreement at each center after four years of monitoring. ECF 21-1. The Independent Monitors found that the centers had made progress toward achieving substantial compliance with the Settlement Agreement but were behind the agreement's time frames for compliance. *Id.* at 2.

Simultaneously with the filing of the Four-Year Report and the retirement of the first Independent Monitor to retire, the Parties notified the Court of their intent to restructure the review process, including developing compliance measures for the provisions of the agreement to focus on an outcome-based approach. Because of the focus on outcomes rather than processes and with the consolidation of the workload to be performed by two monitoring teams, rather than three, the timing of the on-site reviews at each center was modified from every six months to every nine months.

The restructured review process was designated the Quality Service Review ("QSR") and constituted a focused review of a group of residents. The Independent Monitors, in consultation with State staff with expertise in each area of the Settlement Agreement, developed tools ("QSR tools") to measure compliance with each section of the agreement. Each QSR tool describes multiple "indicators" of compliance with a given requirement of the terms of the Settlement Agreement that must be present to achieve substantial compliance. Comparison of the center's performance against these indicators results in a numeric score expressed as a percentage. The QSR process began to be used in January 2015.

Before the transition to the QSR method, the Independent Monitors identified only one center as achieving substantial compliance with one section of the Settlement Agreement. After the transition to the QSR review, they recognized substantial compliance with sections of the agreement at an accelerated pace.

Additionally, the QSR review included a process by which the Independent Monitors designated indicators that received high scores over multiple reviews as in an informal "less active oversight" status. The less active oversight status provided a mechanism for recognizing a center's high performance in a given area even if other indicators measuring that section were not yet in substantial compliance.

E.  Amended Settlement Agreement

Following extended negotiations, on September 1, 2021, the Parties filed a joint motion to modify the 2009 Settlement Agreement. ECF 28. The Court granted that motion on September 7, 2021. ECF 29. The Amended Settlement Agreement focuses the State's obligations more directly on improved outcomes for center residents. The Amended Settlement Agreement formalizes the QSR review process and the nine-month time frame for review, allows for substantial compliance to be recognized at a more discrete level (provision[1] rather than section), and allows for the transition of the responsibility for reviewing a center's compliance with the amended agreement from the Independent Monitors to a team of State Reviewers. ECF 28-1 at Part V.C.

The terms of the Amended Settlement Agreement permit the Independent Monitor or the Parties to recognize a center as being in substantial compliance with a provision. The Parties may agree to recognize substantial compliance with a provision even if all the criteria for achieving substantial compliance have not been uniformly met. *Id.* at Part VI.A. Once the Independent

---

[1] A provision is identified as a portion of the Amended Settlement Agreement that is designated by a capital letter and Arabic numeral within Part II, for example, Part II.C.1., or Part II.D.2, but not at a lower level (e.g., Part II.D.2.a.)

Monitor or the Parties recognize substantial compliance with a provision for one year, the center is no longer subject to monitoring of that provision. *Id.*

Following the adoption of the Amended Settlement Agreement, the Independent Monitors began to recognize the centers as being in substantial compliance with a provision at an even more accelerated rate.

F.   State Reviewers

Beginning in 2017, the State developed an internal quality assurance practice by which a designated team conducted on-site reviews at each center in advance of the review by the Independent Monitors. The State hired a team of designated staff with experience, training, and credentials in the topics covered by the Settlement Agreement. During this review, staff reviewed any provision of the Settlement Agreement which had been recognized as being in substantial compliance, as well as any indicators that had been designated as being in "less active oversight." This review was designated the "State Office Compliance Review" ("SOCR"), and its purpose was to ensure the centers continued to maintain the high performance that had resulted in substantial compliance or less active oversight.

In 2019, as part of the State's general oversight of the centers, it expanded this internal practice to include topics outside the scope of the Settlement Agreement, such as staff morale, compliance with physical plant/architectural requirements, and food-handling safety. The practice consisted of an annual on-site review of each center in anticipation of the center's Medicaid recertification survey. This review was designated the "Quality Review Team" ("QRT") process. To the extent possible, the SOCR and the QRT review occurred simultaneously.

In 2023, following adoption of the Amended Settlement Agreement, the remaining Independent Monitor began working with the State staff who comprised the QRT/SOCR to train

them to assume the duties required for monitoring compliance with the Amended Settlement Agreement. Ex. C (Declaration of Independent Monitor Alan Harchik) at ¶¶ 15-16. This training comprised of orientation, training on the QSR tools, and establishment of interrater reliability with the existing Monitoring Team members. *Id.* at ¶ 18-19. In accordance with Part V.C. of the Amended Settlement Agreement, these staff are referred to as State Reviewers.

As the Independent Monitor approved State Reviewers to perform the monitoring duties, those State staff replaced their cohort on the Monitoring Team. With the exception of Section II.F.[2], the State Reviewers had assumed responsibility for all aspects of the monitoring process as of January 2025. The Independent Monitor has been impressed with the thoroughness and rigor with which the State Reviewers assess the centers' performance, often noting that they scored the centers more strictly than did his team. Ex. C at ¶¶ 17-19.

The State Review ("SR") process consists of off-site record review and onsite observations and interviews. A non-random sample of nine or more residents are selected to review for compliance with Part II of the Amended Settlement Agreement. State Reviewers review the electronic health record of these individuals against the QSR indicators prior to conducting the onsite portion of the review. The onsite portion consists of three days of observation by the State Reviewers and discussions between the State Reviewers and center staff. The SR team provides the center with a report characterizing the center's performance as exceeding, meeting, or not meeting expectations, or as requiring immediate attention.

At the conclusion of each SR, the SR team issues a set of required actions that the center must complete. The state office provides technical assistance and works closely with each center to ensure SR findings are timely addressed. The SR system has proven effective in addressing gaps

---

[2] The QSR tool for Section II.F. has been revised multiple times, with the latest revision becoming final in December 2024. This latest revision delayed the transition to monitoring of this section by State Reviewers until June 2025.

in services and has even led to improvements at the statewide level, like enhancements to the State's policies and procedures.

The SR process is fully funded through the State's FY26-27 biennium. The State intends to continue state office oversight of the centers through the SR process or a similar mechanism as resources allow.

## II.  JUSTIFICATION FOR TERMINATION OF AMENDED SETTLEMENT AGREEMENT

The Parties agree that the State has demonstrated a commitment to ensuring the health and safety of the individuals receiving services in the State's 13 centers and that the State has achieved substantial compliance with the terms of the Amended Settlement Agreement sufficient to warrant termination of the Agreement.

As described in Ex. D (Declaration of Associate Commissioner Laura Cazabon), the State has been implementing improvements to services since the initial notice letter was shared in 2005.

As required by Part VI.A of the Amended Settlement Agreement, substantial compliance with the terms of the Agreement is measured by the centers' ability to demonstrate compliance with the QSR indicators. The steps described by Associate Commissioner Cazabon, Ex. D, Attachment One, and other, more granular, efforts the State has undertaken, have vastly strengthened services and supports for center residents and brought the State into substantial compliance with the Amended Settlement Agreement. As described by the Independent Monitor, 80% of the indicators overall are currently scoring highly or have exited altogether from review. Ex. C at ¶ 10. Of the remaining 20% of the indicators, there is no section of the Amended Settlement Agreement where the State is broadly deficient. *Id.* at ¶ 11. In other words, while some centers are still experiencing a delay in fully implementing the activities needed to satisfy one or more indicators, others are in full compliance, and there is no area where all the centers are

deficient. As identified by the Independent Monitor in his attached declaration, none of the indicators with low scores present a threat to resident safety; many remaining issues involve missing recommended deadlines for document completion, irregularities in document formatting, or omission of one or more expected elements in a document. As the Independent Monitor reports, the centers are aware of these concerns and are on track to fully correct them in the near future. *Id.* at 3-4.

>Part VI.A of the Amended Settlement Agreement provides that:
>
>[N]oncompliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance, shall not constitute failure to maintain substantial compliance. At the same time, in some instances the Parties may agree that a center has achieved substantial compliance with one or more provisions even if all the criteria for achieving substantial compliance have not been uniformly met.
>
>Part VIII.A of the Amended Settlement Agreement provides that:
>
>This Amended Agreement and the Court's jurisdiction to enforce the terms of this Amended Agreement shall terminate when the State has achieved substantial compliance with Part II of this Amended Agreement, pursuant to the requirements set forth in Section VI.A.

Collectively, the current level of compliance with the indicators as described by the Independent Monitor, the structural improvements implemented by the State, and the ongoing SR process support the Parties' determination that the centers have achieved substantial compliance with the terms of the Amended Settlement Agreement. To the extent that there are indicators that have not yet been identified as being in substantial compliance, the ongoing SR process is sufficiently robust to identify those issues, and the State's QA/QI processes are sufficiently robust to implement appropriate corrective action.

Accordingly, pursuant to Part VIII.A, the Amended Settlement Agreement and the Court's jurisdiction to enforce it should terminate.

IV. CONCLUSION

For the reasons set forth above, the parties jointly ask the Court to find that the information contained herein is sufficient to enable the Court to dismiss this case with prejudice given the State's sustained compliance with the terms of the Amended Settlement Agreement in this case. A proposed order is submitted herewith.

Respectfully submitted,

| | |
|---|---|
| JUSTIN R. SIMMONS<br>United States Attorney<br>Western District of Texas | HARMEET K. DHILLON<br>Assistant Attorney General<br>Civil Rights Division |
| | PATRICK MCCARTHY<br>Chief<br>Special Litigation Section |
| LANDON A. WADE<br>Assistant United States Attorney<br>U.S. Attorney's Office<br>903 San Jacinto Blvd., Suite 334<br>Austin, Texas 78701<br>Telephone: (512) 370-1252<br>Landon.Wade@usdoj.gov | /s/ *Benjamin O. Tayloe*<br>BENJAMIN O. TAYLOE (DC Bar No. 425691)<br>Deputy Chief<br>Special Litigation Section<br>Civil Rights Division<br>U.S. Department of Justice<br>950 Pennsylvania Ave. NW, 4CON<br>Washington, DC 20530<br>Telephone: (202) 309-5320<br>benjamin.tayloe@usdoj.gov<br><br>*Counsel for the United States* |

        KEN PAXTON
        Attorney General

        BRENT WEBSTER
        First Assistant Attorney General

        RALPH MOLINA
        Deputy First Assistant Attorney General

        AUSTIN KINGHORN
        Deputy Attorney General for
        Civil Litigation

        KIMBERLY GDULA
        Chief, General Litigation Division

        *Kimberly Gdula*
        KIMBERLY GDULA (TX Bar No. 24052209)
        Chief,
        General Litigation Division
        P.O. Box 12548, Capitol Station
        Austin, Texas 78711-2548
        Phone No.: (512) 463-2120
        Fax No.: (512) 320-0667

## CERTIFICATE OF SERVICE

      I hereby certify that I have electronically submitted for filing, a true and correct copy of the above and foregoing Joint Motion to Dismiss, in accordance with the Electronic Case Filing System of the Western District of Texas, on this 9th day of December, 2025, which will send notification to the following:

Kimberly Gdula
Chief,
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Phone No.: (512) 463-2120
Fax No.: (512) 320-0667

                                                      */s/ Benjamin O. Tayloe*
                                                      BENJAMIN O. TAYLOE
                                                      Deputy Chief